## LOCKHARD & IRELAND vs. SIMON BRODIE & others.

### October Term, 1873.

ASSIGNMENT FOR CREDITORS—BY WHOM MAY BE SUSTAINED IN PART.—The principle, that where there is no fraud in fact nor in law an assignment for creditors may be good to the extent of the debt really due, can have no application to a case where there is fraud in fact on the part of those insisting upon the validity of the deed; it can only be asserted by a creditor who can bring himself within the exception.

EVIDENCE—CONFIDENTIAL COMMUNICATIONS.—An attorney retained by the husband to aid in having land, bought by the husband at chancery sale, conveyed to the wife, cannot be heard to disclose any communication made pending the relation touching the purposes of the conveyance.

WITNESS, ATTORNEY'S COMPETENCY AS.—The fact that a [witness is retained as an attorney in the cause in which he is called to testify, goes to his credibility not his competency.

HUSBAND AND WIFE—IMPROVEMENTS OF WIFE'S REALTY BY HUSBAND.— Money of the husband fraudulently used by him, with intent to hinder and delay his creditors, in putting valuable improvements on his wife's land, may be reached by the creditors to the extent that the improvements have permanently enhanced the value of the land, under the Code, §§ 4282, 4288.  [See note at end of case.]

*M. M. Brien & Son*, for complainants.
*E. H. East*, for defendants.

THE CHANCELLOR:—This bill was filed on the 8th of January, 1867, by complainants, as creditors of the defendant, Simon Brodie, to set aside a deed of trust on a stock of goods made by said Brodie to the defendant, Max Bissinger, on the 18th of December, 1866, because intended to hinder and delay creditors; and also to set aside as a fraudulent

device for the same purpose a deed, made on the 21st of May, 1866, by the clerk and master of this court to the defendant, Sophia Brodie, wife of the said Simon Brodie, of a lot bought by Simon Brodie at a master's sale, and paid for by him.

The facts are that Simon Brodie was doing business as a merchant in Nashville for several years and during the year 1866, purchasing goods from complainants and others in Cincinnati. He bought the lot mentioned at a public sale made on the 9th of January, 1866, for $1,400, and caused the title to be made to his wife in May; and shortly afterwards during the months of June and July he caused to be built on the lot a house which cost about three thousand dollars. These expenditures made it difficult for him to meet his obligation to the complainant and other Cincinnati houses for goods bought, and he wrote several letters to these firms during the month of June asking indulgence on this account. The debts secured by his deed of trust, except one, are all debts for goods, contracted in the month of October following, or shortly after, and due to the complainant and other Cincinnati houses. He seems to have paid up all previous indebtedness, and his purchases in October and afterwards amounted to about $4,000.

By the deed of trust of the 18th of December, 1866, Simon Brodie undertakes to secure all his creditors, not ratably, but in the order of priority in which they are mentioned. The first debt named, and to which preference is given by the deed over all others, is described as a debt to Bernhard Bissinger in the sum of eighteen hundred dollars "due by note on the 1st day of September, 1866." Then follows a debt to Samuels & Holyman, of Cincinnati, of $585; and next a debt to Naff, Egan & Slocumb, of Cincinnati, of $703. Then follows the debt due to complainants, and then in succession debts to several other Cincinnati houses. Simon Brodie and wife, the trustee, Max. Bissinger, and all the persons secured by the deed, other than the complainants, are made defendants to the bill. Bernhard and Max. Bissinger are brothers

of the defendant, Sophia Brodie, the wife of Simon Brodie. The evidence taken in this cause shows that, since the filing of this bill, the trustee has bought the claims of Samuels & Holyman and Naff, Egan & Slocumb at a discount of about 40 per cent. and taken a receipt from them in full. The other creditors mentioned in the deed after the complainants have not answered this bill, but, on the 14th of March, 1867, filed a bill, which will be considered presently, in which they refer to and adopt the charges in this bill, and seek to reach the same property for the satisfaction of their debts.

The first ground assumed by these complainants to set aside the trust deed to Max Bissinger is that it contains pro- visions on its face for the benefit of the grantor which ren- ders it void in law. The conveyance of the goods is abso- lute, and the trustee is authorized to take immediate possession of the store and make an inventory of the goods as soon as practicable. Then follows this provision: "He (the trustee) will then proceed to sell the goods by retail in the house where they are now situated, employing necessary clerks for his assistance. Said trustee is hereby authorized to retain possession of the present house, and to defray the incidental expenses of the same, such as clerk hire, fuel, etc., out of the proceeds of the sale of the goods, which is only to be for cash, he will pay the same." This is the only clause in the deed which seems to be unusual, or at all sub- ject to exception. And it must be admitted that it is a some- what unusual clause. It is not uncommon, nor is it objec- tionable, to give a trustee discretion, until default of payment, for a period not exceeding the usual law's delay to wind up a trust deed for the benefit of creditors. And in such cases, it has even been held that a stipulation that the maker should remain in possession jointly with the trustee, and be his agent for the sale, will not vitiate the deed. *Saunders* v. *Turbeville*, 2 Hum. 728–9. But retaining possession after default of payment is *prima facie* evidence of intent to hinder and delay. *Davison* v. *Handley*, 3 Yer. 502, expounded in *Maney* v. *Killough*, 7 Yer. 440, 445.

The provision of the deed under consideration undertakes, upon an absolute conveyance with authority in the trustee to take immediate possession, to direct the mode of conducting the trust for twelve months. The clause, exceptionable on its face, has been rendered doubly so by the fact that the possession was in fact continued in the grantor, ostensibly as clerk upon a salary, with the power of disposition, subject, however, to account with the trustee. These facts, in connection with the further fact that the one brother-in-law of the grantor is the trustee and another the principal beneficiary, go far to quicken our suspicions of the good faith of the transaction. If to these circumstances there should be added the preference of a fictitious debt over all the other debts secured, and to an amount sufficient to exhaust the greater part of the funds, our doubts would be rendered certainties. And this addition, it is claimed, is to be found.

The bill expressly charges that the alleged debt to Bernhard Bissinger is fictitious, and it expressly calls upon the defendants "to explain and show the consideration of said note, when, where, and how it was created." The defendant, Simon Brodie, says, in his answer, that the debt "was created for money loaned at the time of the date of the note." Bernhard Bissinger, in his answer, said "that the same (the note) was executed and delivered to him by said Brodie for the consideration of money actually paid and *bona fide* loaned." The complainants excepted to this answer because they had called on the defendant to show when, where, and how said note was created. This exception was sustained by the Chancellor, and the defendant filed an amended answer in which, after making the note itself an exhibit, he says: "*And the note will show the date*, which he alleges to be the true and correct date of the same." The date of the note or due-bill is September 1, 1866, and, in view of the allegations of the bill, and the pointed language of the exception, there can be no doubt that both of these defendants intend to be understood as asserting, however guarded their language may be, that the note was executed at the time it

bears date, and for money then loaned. Now, the note and the original deed of trust are filed and are unmistakably in the same hand-writing, and the deposition of Warner Lewis shows that both of these instruments were drawn up by him on the 18th of December, 1866, and were then executed. The answers of the defendants are untrue, and without any motive except it be to give an appearance of genuineness to that which the defendants knew to be false. It need scarcely be said that the recital of a false and fictitious consideration in a deed of assignment for creditors—as a debt asserted to be due and intended to be secured when in fact no such sum was due—is conclusive of an intention to hinder and delay creditors, and the deed must be set aside as void. *Peacock* v. *Tompkins*, Meigs, 317, 329; *Gibbs* v. *Thompson*, 7 Hum. 179; *Bumpas* v. *Dotson*, 7 Hum. 310.

There are several decisions of our supreme court which hold that "*where there is no fraud in fact*," or fraud in law apparent on the face of the instrument, which would avoid it *in toto*, the trust may be held good for the debt really due at the time the deed was made. *Neuffer* v. *Pardue*, 3 Sneed, 191, 195; *Lasell* v. *Tucker*, 5 Sneed, 33; *Ruggles* v. *Williams*, 1 Head, 141, 144; *Alley* v. *Connell*, 3 Head. 578. These decisions can, of course, have no application to a case where the evidence shows fraud in fact on the part of those insisting upon the validity of the deed. The principle settled by them could only be asserted by a *bona fide* creditor who might bring himself within the exception. In this case, there is no such creditor insisting upon the benefits of the deed. The first two Cincinnati creditors are satisfied, and make no claim, and all the others unite in asserting the invalidity of the deed.

Under all the circumstances, I am of opinion that the trust assignment was made to hinder and delay the creditors of the defendant, Simon Brodie, and must be set aside as fraudulent and void.

In relation to the lot conveyed to Sophia Brodie, the bill says: "Whether the defendant Brodie was indebted to any

particular person in a considerable sum, or whether he was indebted to any one at the time of the execution of said deed, complainants are not at this time prepared to say, but believe he was, to what extent they do not know." The defendant, Brodie, denies that he was indebted at all, a denial, in view of his false assertions touching the pretended debt to Bernhard Bissinger, not entitled to any weight except as making up an issue. The complainants have not undertaken to show any indebtedness on his part, and, therefore, the bill cannot be sustained upon the ground of such indebtedness.

Another allegation of the bill is, that at the time Brodie caused this lot to be conveyed to his wife, there was, and for some time afterwards there continued to be, a heavy suit of slander pending in the circuit court of Davidson, brought by one Henry Berwick against the said Simon Brodie, in which the plaintiff claimed damages to the amount of twenty thousand dollars ; and said Brodie, in order to defeat the colleclection of any judgment which might be recovered against him in that suit, caused the deed to the lot to be made to his wife.

The fact of the pending of such a suit is shown, but it is also shown that the defendant put in a plea of justification, and sustained it by depositions taken about the time, or very shortly after the conveyance to his wife, after which Berwick abandoned his suit, and some months afterwards ordered it to be dismissed. The only evidence to show that Brodie had any apprehensions of the result of the suit consists of the deposition of the attorney of Brodie in that suit, who is now the solicitor of the creditors in this case. The witness also says in his deposition : " Before this, Brodie had bought the lot in controversy, had it in possession ; had bought it at chancery sale in his own name and was ready to comply and pay all, *and got me to have a decree or order made to have the deed made to his wife* instead of him ; this I aided in having done." The witness says Brodie was excited about the slander suit, and said to him that he wanted to settle the

lot on his wife and children, so that the plaintiff in that suit might not get it. The defendant, Brodie, excepts to the competency of the witness, and to the admission of his testimony under the circumstances. The objection is two-fold; first, that the witness cannot be heard to speak of any communications made in the course of his professional employment, and secondly that he cannot be allowed to testify in a cause in which he is at the same time acting as counsel.

The general principle is unquestionable that a lawyer will not be permitted, against his client's objection, to testify to any facts done or communications made in the course of his professional engagements, and made on the faith of such engagement. The rule has been established out of regard to the interests of justice, which cannot be upholden, and to the administration of justice which cannot go on, without the aid of men skilled in jurisprudence; and if such communications were not privileged no man would dare to consult a professional adviser. It is not necessary that any judicial proceedings in particular should have been commenced or contemplated; neither does the rule require any regular retainer as counsel, nor any particular form of application or engagement, *nor the payment of fees*. It is enough that he was applied to for advice or aid in his professional character. *Foster* v. *Hall*, 12 Pick. 89; Greenl. Ev. §§ 240, 241. These provisions seem clearly to exclude the evidence in question. It is due to the learned counsel and witness to say that he testifies that he did not consider the communications as confidential, because they were voluntarily made, and made to him in consultation in regard to the Berwick suit with which they had no connection. But the fact that the communications were "voluntary" cannot change their character. As a general rule all communications between attorney and client are voluntary. Nor can the fact that they were made in consulting about the Berwick case take them out of the rule, if the party was induced to make them because he had retained the witness to "aid in having the deed made to his wife in lieu of himself." The retainer for

this purpose was sufficient to seal the lips of the attorney as to any communications on the subject of the client's motives. Code, §§ 3973, 3975.

As to the other objection growing out of the witness' connection with the present suit, there is more doubt. The Roman law, with that refined ethics which characterized it, expressly excluded an advocate from testifying in the cause for his client. Dig. 22, 5, 25. The common law seems to have put the objection on the ground of interest in the particular case. But it has been held in England a very objectionable proceeding on the part of an attorney to give evidence when acting as an advocate in the cause, and a sufficient ground for a new trial. *Dunn* v. *Packwood*, 11 Jur. 242 *a*. And on grounds of public policy, and for the purer administration of justice, the relation of lawyer and client is so far regarded by the rules of practice in some of the courts of the United States, as that the lawyer is not permitted to be both advocate and witness for his client in the same cause. Reg. Gen. Sup. Ct. N. H. ; Reg. 23, 6 N. H. 580 ; *Meishler* v. *Baumgardner*, 1 Amer. L. Journ. 304, N. S. But see *contra*, *Little* v. *Keen*, 1 N. Y. Code R. 4 ; 1 Sandf. 607 ; *Potter* v. *Ware*, 1 Cush. 518, 524, and cases cited by Metcalf, J.

In the absence with us of any such rule of court, and with the objection to testimony on the ground of interest in the witness removed by statute, this court, even if it were inclined to the purer ethics of the civilians, would not feel itself justified in engrafting it on the common law. The position of the witness to the cause must go to credibility, not competency.

If the testimony were competent it would be insufficient, because there would be only one witness, without corroborating circumstances, all the other circumstances tending to show no apprehension of the Berwick suit.

It was, perhaps, scarcely necessary to discuss these points, for even if the testimony be admissible, it is of no efficacy. The proof clearly shows that the Berwick suit was dismissed,

and the claim set up thereby never was a debt of which, or as to which fraud could be predicated. The proof, therefore, wholly fails to show any indebtedness of Brodie at the time of the settlement upon his wife, and the conveyances being upon what the law recognizes as a good consideration, any objection on this ground fails.

The learned counsel of the complainants insists in his brief that the payment of the consideration for the lot by the husband would raise in him a resulting trust which would be subject to the claims of his creditors, citing *Smitheal* v. *Gray*, 1 Hum. 491, and other cases of like purport. But the presumption of a resulting trust which arises from the payment of the purchase-money, may always be rebutted, and the relation of the parties is sufficient for the purpose. *Dudley* v. *Bosworth*, 10 Hum. 9 ; *Robertson* v. *Maclin*, 3 Hay. 70 ; *Hamilton* v. *Bradley*, 5 Hay. 137 ; *Thompson* v. *Thompson*, 1 Yer. 97.

It remains to be considered whether the complainants have any claim upon the lot by reason of the improvements put upon it, for there is not the least proof to make out the charge of the bill that there was fraud in fact as to subsesequent creditors in causing the lot to be conveyed to the wife.

Although the evidence fails to show such indebtedness as avoids the conveyance to Mrs. Brodie, or tends to show that the amount thus settled upon the wife was disproportioned to the husband's estate, at that time, yet the proof does show that the husband became embarrassed by the expenditures made in the improvement of the lot, and failed within three or four months after the completion of these improvements. The defendant claims that at the time of his purchase of the lot he was worth about $4,500 in a stock of goods on hand, and had in bank $1,500, or as he in another place expresses it, "$4,800 independent of the $1,400." Conceding that he was not indebted at the time, the settlement upon his wife of a lot worth $1,400 would not be unreasonable. His letters written in June, after he had com-

menced to improve the house, shows that he was then indebted, and to some of the very firms from whom he subsequently bought goods in October, and was compelled to ask indulgence. These letters show, moreover, that it was the improving of the lot that occasioned his embarrassments. Singularly enough, the complainants have failed to show the extent of his then indebtedness, which, it would seem, might easily have been done. But enough appears to show that he was indebted, and this is, perhaps, sufficient to shift the burden of proof on his shoulders. In his letter to Samuels & Holyman of October 11th, 1866, he says: "I am moving next week in the new house, and as truly I have had more expense with the same than I thought, it has taken nearly five thousand dollars out of my hands, but never mind," etc. In his answer he puts the cost of the house at "about $3,000." If we split the difference between these estimates, we shall have an expenditure of $1,400 on the lot and $4,000 on the improvements, which very nearly covers even his highest estimate of what he was worth, making no allowance for debts, which undoubtedly existed in June, and which, if his own story were true, were increased on the 1st of September, 1866, by the sum of $1,800 borrowed money. It is very clear that so large a settlement upon his wife was, in view of his circumstances, disproportioned to his means, and, as a voluntary settlement, cannot stand against the claims of creditors then in existence, or created in so short a period afterwards as to demonstrate that they were, in effect, a continuation or renewal of debts then in existence. The defendant was a retail merchant who replenished his stock from time to time, and as fast as he had paid off one set of accounts, ran up another. And although the proof does not enable us to carry these debts and renewals with confidence behind the master's deed of the 21st of May, 1866, yet it does satisfy the mind that such renewals must have been made after that settlement and of debts in existence as early as June, 1866.

The title of the wife to the lot being held good, and the

improvements subsequently put upon that lot by the husband being disproportioned to his means, and made with a fraudulent intent to cover up his effects to that extent from his creditors, the question arises whether the money thus invested can, in any way, be reached in this court by the creditors.

It was held by the supreme court of this state, in *Erwin* v. *Oldham*, 6 Yer. 185, the decision being rested on the authority of *Donovan* v. *Finn*, 1 Hop. 59, that chancery had no jurisdiction, in the absence of trust or other independent ground of equity, to subject a debtor's money, stock, choses in action, etc., to the satisfaction of judgments against him, whether in his own hands, or those of a voluntary donee, upon the ground that the jurisdiction of chancery was only ancillary, and could not be exerted where the property itself would not be the subject of an execution. The doctrine of *Donovan* v. *Finn* produced in New York the act of their legislature of 1828, 2 Rev. Stat. 174, §§ 41-2, and this act was almost literally copied by the legislature of this state in our act of 1832, ch. 11. See Edw. on Rec. 397, where the New York statute is quoted. It was also held by our supreme court in *Ewing* v. *Cantrell*, Meigs, 364, that the jurisdiction of this court, under the statute against fraudulent conveyances (1801, 25, 2, Code, § 1,759), was also ancillary to remove impediments to executions at law, and would not be exercised where the property sought to be made liable in equity could not be reached at law, even if no obstruction existed. The court refused, therefore, in this case to follow, at the instance of judgment-creditors, the money of the debtor mingled by him with that of his mother, and, without any secret trust, or intentional fraud, invested in improvements upon his mother's real estate. It was conceded, however, in that case, that if an embarrassed man should erect valuable improvements on the realty of another of little value, intentionally and with knowledge on the part of that other of his condition, it would "incontestably prove the existence of a trust," and probably be treated accordingly.

Since this decision, and the act of 1832, 11, the act of 1852, 365, 10, carried into the Code, § 4,288, et seq. has been passed. Section 4,288 is in these words: "Any creditor, without first having obtained a judgment at law, may file his bill in chancery for himself, or for himself and other creditors, to set aside fraudulent conveyances of property, or other devices resorted to for the purpose of hindering and delaying creditors, and subject the property, by sale or otherwise, to the satisfaction of the debt." Statutes made to suppress fraud are to be liberally expounded, and the words "conveyances" and "devices" are used in an enlarged sense. *Wilson* v. *Beadle*, 2 Head. 510, 513; *August* v. *Seeskind*, 6 Cold. 166, 172. Under the law as it now stands, a judgment-creditor, whose execution has been returned unsatisfied in whole or in part, may come into this court to compel the discovery of, and subject to the satisfaction of his debt any property, "including stocks, choses in action, or money due to the such defendant or held in trust for him," whether such property could, in the defendant's possession, or with the title vested in him, be levied upon by execution or not. Code, §§ 4,282, 4,283. And any creditor, without first having obtained a judgment at law, may come into this court to set aside fraudulent conveyances of property, or other devices resorted to for the purpose of hindering and delaying creditors, and subject the property to the satisfaction of his debt. The principles upon which *Erwin* v. *Oldham* and *Ewing* v. *Cantrell* are rested have been effectually changed by statute. Money may be reached in this court, no matter what fraudulent device may be resorted to for the purpose of hindering the creditor.

Notwithstanding these statutory changes, the application of the law to the facts of this case is by no means free from difficulty. I had occasion to consider the subject at this term in *McFerrin* v. *Carter*. In that case, the father of Carter's wife had bought for, and settled upon his daughter a lot in South Nashville which cost $600. On this lot, a dwelling and other improvements had been erected princi-

pally by the husband at an expenditure of $1,400. The bill was filed by a judgment-creditor of the husband to reach the value of these improvements, who failed to show any fraudulent intent. I was of opinion, that in the absence of proof of positive fraud to hinder and delay creditors in which the wife must be implicated, our authorities were clear that the wife's title to the land and improvements could not be disturbed. Citing *Ewing*, v. *Cantrell*, Meigs, 364; *Knott* v. *Carpenter*, 3 Head. 542; *Marable* v. *Jordan*, 5 Hum. 417.

In the case now before us, the fraudulent intent on the part of the husband clearly exists, and the improvements are largely disproportioned to the value of the lot, and have absorbed the husband's estate. There is no direct proof implicating the wife in any fraudulent design or device. And the question is, whether such direct proof is essential to establish fraud within the statute, or "the existence of a trust" for the husband in the language of the court in *Ewing* v. *Cantrell?* But the rule from the earliest time, has been that a voluntary conveyance, if fraudulent as to the grantor, is equally fraudulent as to the voluntary grantees, even in the case of wife and children. *Taylor* v. *Jones*, 2 Atk. 600; Kerr on Fraud, 199, and cases cited. If the money voluntarily invested by the husband can be reached at all, the absence of active participation on the part of the wife cannot affect the creditor's rights. And it seems to me to allow such investments to escape the claims of creditors would open a very wide door to fraud.

I am of opinion, therefore, that the complainants are entitled, if the trust assets prove inadequate to pay their debts, to subject the improvements in question to the extent to which they have enhanced the value of the lot, by a sale of the lot and improvements, the sum of $1,400, or the value of the lot, if it exceeds that sum at the date of the sale, being reserved and secured to the sole and separate

use of the said Sophia Brodie free of costs. Decree accordingly.

NOTE.—Upon appeal, the decision of the Chancellor was affirmed so far as it ruled that the conveyance of the lot in controversy to Brodie's wife was valid, and that the attorney was incompetent to testify to the husband's admissions touching the object of the conveyance. The supreme court was of opinion, however, that the debt of Bernhard Bissinger was not fictitious, and that the acquiescence of the wife in the improvements made by the husband was not sufficient to affect her with the husband's fraud, and reversed the decision upon these points. The case of *McFerrin* v. *Carter*, mentioned in the foregoing opinion, was affirmed.